UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------

ARTEM SHALOMAYEV, *as owner and operator*
*of 3715 Barber Shop, Inc., individually and on*
*behalf of all others similarly situated*,

                           Plaintiff,

                    v.

ALTICE USA, INC.,

                           Defendant.

------------------------------------------------------------

**MEMORANDUM & ORDER**
21-CV-5540 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Artem Shalomayev, on behalf of himself as owner and operator of 3715 Barber

Shop, Inc. (the "Barbershop") and others similarly situated, commenced the above-captioned

class action against Defendant Altice USA, Inc. on October 6, 2021, alleging claims of

fraudulent inducement, fraudulent concealment, deceptive acts or practices, and unjust

enrichment based on Defendant's termination of Plaintiff's internet and telephone services and

Defendant's refusal to reinstate services until Plaintiff paid outstanding fees and an additional

"one-time set up fee." (Compl. ¶¶ 6–8, 112–39, Docket Entry No. 1.) On March 21, 2022,

Defendant moved to compel arbitration, and Plaintiff opposed the motion.[1]

      For the reasons set forth below, the Court grants Defendant's motion to compel

arbitration and stays this litigation.

---

    [1] (Def.'s Mot. to Compel Arb. ("Def.'s Mot."), Docket Entry No. 19; Def.'s Mem. in
Supp. of Def.'s Mot. ("Def.'s Mem."), Docket Entry No. 20; Pl.'s Opp'n to Def.'s Mot. ("Pl.'s
Opp'n"), Docket Entry No. 21; Def.'s Reply in Supp. of Def.'s Mot. ("Def.'s Reply"), Docket
Entry No. 22.)

## I.  Background

The Court assumes the truth of the factual allegations in the Complaint for the purposes

of this Memorandum and Order.

### a.  The parties

Plaintiff is a resident of Nassau County, New York, and owns, operates, and maintains

the Barbershop, which is located at 3715 Riverdale Avenue in the Bronx, New York.  (Compl. ¶¶

16–17.)  Defendant is incorporated in Delaware and has its principal place of business in Long

Island City, New York, employs approximately 16,000 employees, and has an annual revenue of

$9.2 billion.  (*Id.* ¶¶ 18–19.)  Along with its subsidiaries, Defendant provides broadband

communications and video services in the United States and is the fourth largest cable provider

in the United States "operating under, among other brands, Altice, Optimum, Lightpath, and

Suddenlink."  (*Id.* ¶ 19.)  Defendant also provides cable services to approximately 4.9 million

residential and business customers in twenty-one states, including broadband, pay television,

telephone services, proprietary content, and advertising services.  (*Id.*)

### b.  The February 5, 2020 Agreement

On February 5, 2020, Plaintiff placed an order to receive internet services at the

Barbershop, and a sales representative presented Plaintiff with a mobile device displaying an

order receipt.  (Decl. of John DeMasi in Supp. of Def.'s Mot. ("Demasi Decl.") ¶¶ 3–4, Docket

Entry No. 20-3.)[2]  To complete the transaction, Plaintiff had to electronically sign the receipt

under a series of "Terms & Conditions," which provided that "[Plaintiff] agree[d] to be bound by

---

[2]  A court may consider documents outside of the pleadings for the purposes of
determining the arbitrability of a dispute.  *Murphy v. Canadian Imperial Bank of Com.*, 709 F.
Supp. 2d 242, 244 n.2 (S.D.N.Y. 2010) (first citing *Sphere Drake Ins. Ltd. v. Clarendon Nat'l
Ins. Co.*, 263 F.3d 26, 32–33 (2d Cir. 2001); and then citing *BS Sun Shipping Monrovia v. Citgo
Petrol. Corp.*, No. 06-CV-839, 2006 WL 2265041, at *3 (S.D.N.Y. Aug. 8, 2006)).

the General Terms [and Conditions] of Service" (the "General Terms of Service") and further "agree[d] that any use by [Plaintiff] of these services [was] deemed acknowledgement that [Plaintiff] read, understood and agreed to be bound by such terms and conditions" (the "February 2020 Agreement"). (*Id.* ¶ 4.)  An order confirmation was emailed to the address Plaintiff provided alongside a copy of the order receipt and a copy of the version of the General Terms of Service that were then in effect.  (*Id.* ¶ 5.)  The operative General Terms of Service, which were in effect from September 28, 2018, until October 1, 2021, indicated that they "contain[ed] a binding arbitration agreement that affect[ed] [the customer's] rights, including the waiver of class actions and jury trials" and also contained provisions for opting out of arbitration.  (General Terms of Service 1, annexed to Decl. of William Heberer in Supp. of Def.'s Mot. ("Heberer Decl.") as Ex. 1, Docket Entry No. 20-2; Heberer Decl. ¶ 4, Docket Entry No. 20-1.)

The arbitration provision incorporated in the February 2020 Agreement provided that the opt-out provision did not apply if a customer had been an existing subscriber for at least thirty days before the effective date of the agreement, but that otherwise, a customer could indicate a request to opt out of arbitration by providing Defendant with written notice.  (*Opting out of Arbitration*, General Terms of Service § 26(a).)  Claims covered by the provision included "[c]laims arising out of or relating to any aspect of the relationship between [Defendant and the customer], whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory," "[c]laims that arose before this or any prior [a]greement," and "[c]laims that may arise after the termination of this [a]greement."  (*Binding Arbitration*, General Terms of Service § 26.)  If the amount in dispute was less than $50,000, the customer could determine whether the arbitration would be conducted solely on the basis of documents submitted to the neutral arbitrator, by telephonic hearing, or by an in-person hearing.  (*Arbitration Process*, General

Terms of Service § 26(d).)  With exceptions for frivolous or improper claims, Defendant agreed to "pay all arbitration filing, administrative, and arbitrator fees for any arbitration that [Defendant] commence[d] or that [the customer] commence[d] seeking damages of $10,000 or less." (*Arbitration Fees*, General Terms of Service § 26(e).)  The customer agreed to forfeit rights to class, representative, and private attorney general arbitrations and actions.  (*Waiver of Class and Representative Actions*, General Terms of Service § 26(g).)  "The terms of the arbitration provision . . . survive[d] termination, amendment or expiration of th[e] [a]greement." (*Severability and Survival*, General Terms of Service § 26(h).)

      **c.   The Covid-19 pandemic**

In response to the rapid spread of the global Covid-19 pandemic, "every state made an emergency declaration by March 16, 2020," and civil authorities in "nearly every state" also ordered some form of social distancing measures, including stay-at-home orders, restrictions on large gatherings, and orders closing or restricting service at restaurants and bars.  (Compl. ¶ 26.)  In New York, former Governor Andrew Cuomo declared a state disaster emergency on March 7, 2020, that lasted until September 7, 2020.  (*Id.* ¶ 27.)  Governor Cuomo signed Executive Order No. 202.8 on March 20, 2020, which closed all non-essential businesses statewide as of 8:00 P.M. on March 22, 2020.  (*Id.* ¶ 32.)  The Barbershop "did not qualify as an 'essential business'" under any of the categories enumerated by New York State, and by law, Plaintiff shut down his business operations on March 20, 2020.  (*Id.* ¶ 33.)  As a result of the lockdown, the Barbershop was "physically shut down and [Plaintiff] was barred from opening up [the Barbershop] during this time period."  (*Id.* ¶ 45.)  Plaintiff was unable to retrieve any mail, including bills from Defendant, during this time period, and did not enter the Barbershop because of his fear that

"merely opening his doors would violate the Governor's decree and subject him to the imposition of penalties and fees." (*Id.* ¶¶ 46, 50.)

In response to the Covid-19 pandemic, Ajit Pai, the former Chairman of the Federal Communications Commission (the "FCC") announced the "Keep Americans Connected Initiative" on March 13, 2020, and promised that it would extend until June 30, 2020. (*Id.* ¶ 34.) "[T]o ensure that American individuals and small businesses did not lose their broadband and telephone service providers," Pai specifically asked broadband and telephone service providers and trade associations to join the "Keep Americans Connected Pledge" (the "Pledge"), and more than 800 companies and associations signed the Pledge, including Defendant. (*Id.* ¶¶ 35, 36.) Through the Pledge, companies pledged to:

> 1. Not terminate service to any residential or small business customers because of their inability to pay their bills due to the disruptions caused by the coronavirus pandemic;
>
> 2. Waive any late fees residential or small business customers incur because of their economic circumstances related to the coronavirus pandemic; and
>
> 3. Open [their] Wi-Fi hotspots to any American who needs them.

(*Id.* ¶ 35.) Defendant announced that it had committed to the Pledge on its website and social media, indicating its commitment for the "next [sixty] days" to "[n]ot terminate broadband and voice service to any residential or small business customers because of their inability to pay their bills due to the disruptions caused by the coronavirus pandemic" and "[w]aive any late fees that any residential or small business owners incur[red] because of their economic circumstances related to the coronavirus pandemic." (*Id.* ¶ 37.) Defendant's Chief Executive Officer, Dexter Goei, made a statement that Defendant was "proud to do its part in ensuring that customers and business[es] . . . have reliable access to the connectivity services that are critically important during this rapidly evolving public health situation." (*Id.* ¶ 38.)

Plaintiff read about the Pledge on or about March 15, 2020, and was "relieved," because his business was closed and he did not have any income. (*Id.* ¶¶ 42–44.)

### d.   Defendant's invoices and termination of Plaintiff's service

In April of 2020, Defendant sent Plaintiff an invoice "with fees for his alleged phone usage and internet usage for the period of March 16, 2020, to April 15, 2020, including a 'Total Internet' charge of $55.44 and a 'Total Phone' charge of $34.95," for a total of $89.11 for Plaintiff's use of internet and phone services for this one-month period. (*Id.* ¶ 48.) Plaintiff was "legally barred from operating his hair salon during this same one-month period," and did not enter the Barbershop, see the bill that Defendant had sent him, or make any payment towards the bill. (*Id.* ¶ 50.)

In May of 2020, Defendant sent Plaintiff another monthly bill for Plaintiff's alleged use of internet and phone services during the time period of April 16, 2020, to May 15, 2020, for $97.89. (*Id.* ¶¶ 51–52.) Defendant also included the previous month's unpaid bill, for a "[t]otal [a]mount [d]ue" of $187.00. (*Id.* ¶ 53.) Plaintiff did not see this bill for the same reasons he did not see the prior month's bill. (*Id.* ¶ 54.) Plaintiff "had no idea that he now owed [Defendant] for two months of internet and phone services which he had never actually used." (*Id.*)

In June of 2020, Defendant sent another bill to Plaintiff for his alleged use of internet and phone service for the time period of May 16, 2020, to June 15, 2020, for a sum of $91.90. (*Id.* ¶ 55.) Defendant indicated that Plaintiff owed a total of $284.89 for phone and internet services from March of 2020 to June of 2020, "even though he had never set foot in [the Barbershop]" or "used any of [Defendant's] services" during this time period. (*Id.* ¶ 56.)

In anticipation of Governor Cuomo allowing "certain non-essential businesses, including barbershops and hair salons, to reopen in July," Plaintiff returned to the Barbershop in mid-June

of 2020.  (*Id.* ¶ 58.)  At that time, Plaintiff learned about the outstanding payments and that

Defendant "had continued fully charging him for the entire [three] months during the Covid

lockdown."  (*Id.* ¶¶ 59–60.)  Plaintiff also learned that Defendant had terminated all of Plaintiff's

services, including his telephone and internet services, based on Plaintiff's alleged failure to pay

Defendant for three months of bills.  (*Id.* ¶ 61.)

   **e.   Defendant's installation fee**

   After realizing that his phone lines and internet were not working, on or about June 17,

2020, Plaintiff called Defendant's toll-free customer service line, where a representative told

Plaintiff that "small business customers were . . . still obligated to fully pay their bills in a timely

manner, and that their failure to do so would automatically result in a termination of services"

"regardless of what he may have read about [Defendant's] promise to not terminate services

during Covid."  (*Id.* ¶¶ 65–66.)  The customer service representative explained that termination

of service had always been Defendant's policy regarding non-payment of bills, and that there

would be no exceptions "regardless of any hardships or business disruptions caused by the Covid

pandemic."  (*Id.* ¶ 67.)

   Plaintiff asked whether Defendant would restore his service if he agreed to pay the

outstanding bills in full, but the representative "summarily rejected this request."  (*Id.* ¶¶ 68–69.)

The representative informed Plaintiff that once Defendant terminated a customer's service, the

service was permanently disconnected.  (*Id.* ¶ 69.)  The only way to activate phone and internet

service would be to set up a new service account, with a "[o]ne [t]ime [a]ctivity" fee.  (*Id.*)

Plaintiff refused to pay an additional fee, but the representative insisted that "this payment was

necessary before service could be restored."  (*Id.* ¶ 70.)  The representative told Plaintiff that

Defendant charged the fee to install new equipment to restore the services.  (*Id.* ¶ 71.)  Plaintiff

contends that "[u]pon information and belief, this false statement was part of a uniform, mandatory script that [Defendant's] representatives were required to use when trying to convince recently terminated customers to pay the '[o]ne [t]ime [a]ctivity' fee in order to reactivate their service." (*Id.* ¶ 72.)  However, "reconnecting the customer's service was something that could be done fairly quickly and with no new equipment." (*Id.* ¶ 75.)  Plaintiff had already paid an additional $99.99 fee in late February of 2020, when he had "upgraded his service plan and added internet services" for the Barbershop. (*Id.* ¶ 81.)

Plaintiff explained to the representative that because he had lost all of his customers through the Covid-19 shutdown, "it was an extreme economic hardship" for him to have to pay the additional fee in addition to the outstanding bills from the prior three months. (*Id.* ¶ 77.) Plaintiff noted that the phone number was critical and had been the same number since the early 1970s, "long before Plaintiff had purchased the business back in 2011." (*Id.* ¶¶ 78, 85.)  The representative told Plaintiff that Defendant would not be able to "hold the same phone number open for Plaintiff," and that if he did not provide a credit card to pay the additional installation fee, "Plaintiff would very likely lose his longstanding number, as it would enter back into a pool of unused numbers and would promptly be reassigned to another business or residential customer." (*Id.* ¶ 84.)

Plaintiff agreed to pay the $180.00 one-time activity fee by phone and believed that he entered into a new service agreement (the "June 2020 Agreement"), but Defendant never presented Plaintiff with a written agreement and did not disclose any of the material terms and conditions of the new agreement that "it had pressured Plaintiff to enter into for the restoration of his service." (*Id.* ¶¶ 86–87.)  Plaintiff was not aware of any terms, conditions, or limitations. (*Id.* ¶ 88.)

### f.    Plaintiff's subsequent bills

On July 5, 2020, Governor Cuomo formally announced that several categories of non-essential businesses, including barbershops, hair salons, nail salons, spas, and tanning salons, could reopen.  (*Id.* ¶ 96.)  Plaintiff reopened the Barbershop "[s]hortly thereafter."  (*Id.* ¶ 97.)  In August of 2020, Plaintiff received his first monthly phone bill under the new service agreement and realized that Defendant had doubled the total phone charge from $34.95 to $69.90, "in effect imposing a late fee penalty" on top of the $180.00 one-time activity fee.  (*Id.* ¶¶ 90, 98.)

## II.    Discussion

### a.    Standard of review

The Federal Arbitration Act (the "FAA") requires courts to compel arbitration of claims that the parties have agreed to arbitrate.  *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  "Courts consider two factors when deciding if a dispute is arbitrable: '(1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue.'"  *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 179 (2d Cir. 2021) (quoting *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015)); *see Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019) ("The threshold question facing any court considering a motion to compel arbitration is . . . whether the parties have indeed agreed to arbitrate." (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012))).

Generally, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *see also Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. BMC Stock Holdings, Inc.*, 796 F. App'x 45, 48 (2d Cir. 2019) (same).  When an agreement is

clear, "it is the language of the contract that defines the scope of disputes subject to arbitration." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002); *see also Abdullayeva v. Attending Homecare Servs. LLC*, 928 F.3d 218, 222 (2d Cir. 2019) ("In answering the first question — whether the parties agreed to arbitrate — we look to 'state contract law principles.'" (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016))).

In deciding a motion to compel arbitration, courts apply a similar standard to that applied to a motion for summary judgment and "draw all reasonable inferences in favor of the non-moving party." *Nicosia*, 834 F.3d at 229 (citing *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171–72 (2d Cir. 2011)); *see also Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 833–34 (2d Cir. 2021) (first quoting *Nicosia*, 834 F.3d at 229; and then quoting *Meyer v. Uber Techs., Inc*., 868 F.3d 66, 74 (2d Cir. 2017)). The party "seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010) (citing *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91–92 (2000)). In addition, "[a] district court must stay proceedings once it is 'satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding.'" *Nicosia*, 834 F.3d at 229 (quoting *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997)); *see also Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015) ("[A] stay of proceedings [is] necessary after all claims have been referred to arbitration and a stay requested.").

> **b.   The February 2020 Agreement's arbitration provision is enforceable and Plaintiff's claims fall within its scope**

Defendant contends that Plaintiff "entered into a binding agreement to arbitrate his disputes with [Defendant] when he ordered his Optimum services in February [of] 2020."

(Def.'s Mem. 7–10.)  Defendant also argues that Plaintiff's dispute falls within the scope of the arbitration provision because the February 2020 Agreement covers "[c]laims arising out of or relating to any aspect of the relationship between" Plaintiff and Defendant "whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory."  (*Id.* at 11 (quoting *Binding Arbitration*, General Terms of Service § 26).)  In addition, Defendant argues that the February 2020 Agreement provides that the "[t]erms of the arbitration provision shall survive termination, amendment or expiration of th[e] [a]greement."  (*Id.* at 12 (quoting *Severability and Survival*, General Terms of Service § 26(h)).)  Defendant notes that the terms of the February 2020 Agreement would be the same as those of the June 2020 Agreement, as the same General Terms and Conditions to which Plaintiff agreed in February of 2020 were in effect in June of 2020.  (*Id.* at 13 n.5; *see* Heberer Decl. ¶ 4.)

Plaintiff contends that the Court should not compel arbitration because the February 2020 Agreement's arbitration provision did not carry over into the June 2020 Agreement, the June 2020 Agreement governs the parties' claims, and the parties never agreed to arbitrate claims arising under the June 2020 Agreement.  (Pl.'s Opp'n 4–9.)

"[D]espite the strong federal policy favoring arbitration, arbitration remains a creature of contract," and courts must therefore "decide whether the parties to a contract have agreed to arbitrate disputes."  *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019) (citations omitted); *see also Henry Schein, Inc. v. Archer & White Sales, Inc.*, --- U.S. ---, ---, 139 S. Ct. 524, 529 (2019) ("[A]rbitration is a matter of contract, and courts must enforce arbitration contracts according to their terms." (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010))); *Holick*, 802 F.3d at 395 ("[A] party cannot be required to submit to arbitration any dispute which [the party] has not agreed so to submit." (quoting *JLM Indus., Inc. v. Stolt–Nielsen*

*SA*, 387 F.3d 163, 171 (2d Cir. 2004))); *Lowry v. OppenheimerFunds, Inc.*, No. 20-CV-2288, 2022 WL 976823, at *4 (S.D.N.Y. Mar. 31, 2022) ("A court's primary objective in interpreting a contract 'is to give effect to the intent of the parties as revealed by the language of their agreement.'" (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000))).  The question of whether parties have agreed to arbitrate "is governed by state-law principles of contract formation."  *Starke*, 913 F.3d at 288; *see also Meyer*, 868 F.3d at 74 ("State law principles of contract formation govern the arbitrability question." (quoting *Nicosia*, 834 F.3d at 231)).  "To create a binding contract under New York law, the parties must provide a 'manifestation of mutual assent sufficiently definite to assure that they are truly in agreement with respect to all material terms.'"  *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 199 (2d Cir. 2019) (quoting *Stonehill Capital Mgmt., LLC v. Bank of the W.*, 28 N.Y.3d 439, 448 (2016)) (alterations omitted); *see also Starke*, 913 F.3d at 288 ("It is a basic tenet of contract law that, in order to be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'").  "Where the parties dispute whether the contract requires arbitration, . . . the threshold question is 'whether the contract terms are ambiguous.'"  *Naylor v. Valicenti*, No. 20-CV-4037, 2022 WL 761891, at *1 (2d Cir. Mar. 14, 2022) (quoting *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000)).  "Where the question is whether a given dispute falls within the scope of the arbitration agreement (and is therefore arbitrable), '[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'"  *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 317 (2d Cir. 2021) (quoting *First Options of Chicago v. Kaplan*, 514 U.S. 938, 944–45 (1995)).

i. **The February 2020 Agreement's arbitration provision is enforceable**

The February 2020 Agreement's arbitration provision is enforceable.  On February 5, 2020, Plaintiff electronically signed the February 2020 Agreement, which stated that he "agree[d] to be bound by the General Terms of Service" and that "any use . . . of these services [was] acknowledgement that [he] ha[d] read, understood and agreed to be bound by such terms and conditions."  (February 2020 Agreement, annexed to DeMasi Decl. as Ex. 1, Docket Entry No. 20-4.)  The February 2020 Agreement also provided a link to the Defendant-affiliated website where Plaintiff could view all of the General Terms of Service.  (*Id.*)  When Plaintiff received an email order confirmation, he also received a copy of the General Terms of Service that were then in effect.  (DeMasi Decl. ¶ 5.)  Plaintiff does not allege any fraud or unconscionability in the formation of this contract or in its language.  (*See generally* Compl.) That the arbitration provision was incorporated in the February 2020 Agreement through reference to the General Terms of Service rather than being in the Agreement itself does not affect its enforceability.  *See Pagaduan v. Carnival Corp.*, 709 F. App'x 713, 716 (2d Cir. 2017) (finding that arbitration was warranted where a single-page contract "reference[d] secondary documents . . . that . . . call[ed] for arbitration" and that the contract "incorporate[d] the [s]tandard [t]erms and [c]onditions and its arbitration provision by reference as a matter of law"); *Aceros Prefabricados, S.A. v. TradeArbed, Inc.*, 282 F.3d 92, 97 (2d Cir. 2002) (affirming that the Second Circuit has "specifically found that parties were bound to arbitrate under arbitration clauses they never signed, where those clauses were contained in other documents that were incorporated by reference"); *Schwartz v. Sterling Ent. Enters., LLC*, No. 21-CV-1084, 2021 WL 4321106, at *3 (S.D.N.Y. Sept. 23, 2021) ("[C]onclusive presumption of knowledge and assent applies also to the terms of a separate document that is incorporated into a contract by reference,

even when the party resisting arbitration contends that he never received the incorporated document." (footnote omitted) (collecting cases)); *Moskalenko v. Carnival PLC*, No. 17-CV-6947, 2019 WL 1441127, at *7 (E.D.N.Y. Mar. 29, 2019) ("Because the court finds that [the] arbitration agreement was incorporated by reference into the portion of the employment agreements that [the] [p]laintiff signed, the court finds that a written agreement to arbitrate existed between the parties."); *see also 4Connections LLC v. Optical Commc'ns Grp., Inc.*, 618 F. Supp. 2d 178, 183–84 (E.D.N.Y. 2009) ("A party's failure to read the terms of an incorporated document does not make those terms any less binding." (citing *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996))).

Thus, the February 2020 Agreement and its incorporated arbitration provision are enforceable.

### ii. Plaintiff's claims fall within the scope of the February 2020 Agreement

Plaintiff's claims fall within the scope of the February 2020 Agreement's arbitration provision because the language in the arbitration provision expressly indicates an intention to arbitrate disputes such as the one before the Court.

Claims covered by the February 2020 Agreement's arbitration provision include "[c]laims arising out of or relating to any aspect of the relationship between [Defendant and the customer], whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory," "[c]laims that arose before this or any prior [a]greement," and "[c]laims that may arise after the termination of this [a]greement." (*Binding Arbitration*, General Terms of Service § 26.) Plaintiff's claims against Defendant, which arise out of "alleged 'non-payment' of monthly service fees from March 15, 2020 to June [of] 2020, during the height of the Covid pandemic," and "an exorbitant one-time 'start-up' fee" following termination of Plaintiff's services, are

within the scope of the February 2020 Agreement.  (Compl. ¶¶ 2–3); *see In re Generali Covid-19 Travel Ins. Litig.*, --- F. Supp. 3d --, ---, 2021 WL 6052127, at *6 (S.D.N.Y. Dec. 21, 2021) ("Accordingly, the close nexus between the agreement and the dispute made it foreseeable that the arbitration provision would apply to transactions collateral to the . . . transaction."); *Watson v. USA Today Sports Media Grp., LLC*, No. 17-CV-7098, 2018 WL 2316634, at *2–3 (S.D.N.Y. May 8, 2018) (granting defendants' motion to compel arbitration where the clause provided for arbitration of "any dispute arising under" the agreement and collecting cases); *Bristol-Myers Squibb Co. v. SR Int'l Bus. Ins. Co., Ltd.*, 354 F. Supp. 2d 499, 504–506 (S.D.N.Y. 2005) (finding that a dispute "arises under" an agreement where the dispute goes to the "interpretation of the contract and matters of performance").  Plaintiff's claims that Defendant "not only sought to recoup payments for the charges which it had pledged not to collect" but also "coerced small businesses into entering new service agreements" in order to restart their telephone and internet services fall within the broad language of the arbitration provision.  (Compl. ¶ 3.)

Further, while Plaintiff claims that the June 2020 Agreement is operative and also claims that the question of whether there was a June 2020 Agreement[3] "raises a factual question that cannot be resolved at the pleading stage," (Pl.'s Opp'n 5), the plain terms of the February 2020 Agreement specify that "[t]he terms of the arbitration provision shall survive termination, amendment or expiration of th[e] [a]greement."  (*Severability and Survival*, General Terms of Service § 26(h).)  "When interpreting a contract, the intention of the parties should control, and the best evidence of intent is the contract itself."  *Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d

---

[3]  Plaintiff appears to argue that he entered into a new contract, that the June 2020 Agreement is operative, (Pl.'s Opp'n 4), that he did not agree to arbitrate in the new contract, (*id.* at 5), and therefore should not have to arbitrate, and that, although he entered this new contract, "[a]t a minimum," the question of whether there was a new contract cannot be resolved at the pleadings stage, (*id.*).

169, 180 (2d Cir. 2010) (internal quotation marks and alterations omitted) (quoting *Hatalmud v. Spellings*, 505 F.3d 139, 146 (2d Cir. 2007)); *see also Lowry*, 2022 WL 976823, at *4 ("A court's primary objective in interpreting a contract 'is to give effect to the intent of the parties as revealed by the language of their agreement.'" (quoting *Compagnie Financiere*, 232 F.3d at 157)).  Thus, the Court need not address questions raised as to the June 2020 Agreement because Plaintiff's challenges are covered by the February 2020 Agreement.

Plaintiff's reliance on several inapposite cases to argue that a prior agreement's arbitration clause will not carry into an entirely new agreement is misplaced, as these cases are distinguishable.  (Pl.'s Opp'n 6 (first citing *Matter of Waldron (Goddess)*, 61 N.Y.2d 181 (1984); then citing *Donnkenny Apparel, Inc. v. Lee*, 736 N.Y.S.2d 862 (App. Div. 2002); then citing *On Line Power Techs., Inc. v. Square D Co.*, No. 03-CV-4860, 2004 WL 1171405 (S.D.N.Y. Apr. 20, 2004); and then citing *Int'l Ass'n of Bridge, Structural, & Ornamental Iron Workers v. J & N Steel & Erection Co.*, 8 F. App'x 381 (6th Cir. 2001)).)  In *Waldron*, the court denied a motion to compel arbitration, finding that the arbitration agreement between an employee and the employer could not be extended to include an employee who was not a party to the agreement.  61 N.Y.2d at 185.  In *Donnkenny Apparel, Inc.*, the court ruled that the oral agreement of the parties to arbitrate was insufficient to compel arbitration.  736 N.Y.S.2d at 862.  In *On Line Power Techs., Inc.*, the court ruled that the claims did not arise from the initial agreement because the parties had attempted to negotiate a replacement written contract and dealt with interim orders on an individual basis by creating "separate written documents memorializing the terms" of those orders.  2004 WL 1171405, at *8.  Finally, in *Int'l Ass'n of Bridge, Structural, & Ornamental Iron Workers*, the court found that "where the dispute turns not on whether the parties ever

agreed to arbitrate, but rather whether an agreement to arbitrate has expired or terminated, the question of termination is for the arbitrator."  8 F. App'x at 386.

Unlike in *Waldron*, the parties before the Court were parties to the February 2020 Agreement, and there is a provision in the February 2020 Agreement that explicitly states that its arbitration provision survives termination.  In addition, unlike in *Donnkenny Apparel*, the February 2020 Agreement was a written agreement, rather than an oral agreement.  Similarly, unlike *On Line Power Techs., Inc.*, the claims arise out of the February 2020 Agreement, as they relate to services that Plaintiff obtained pursuant to the February 2020 Agreement.  Finally, unlike *Int'l Ass'n of Bridge, Structural, & Ornamental Iron Workers*, Plaintiff's challenge to the arbitration provision incorporated into the February 2020 Agreement turns on whether the agreement to arbitrate has terminated, not whether the parties ever agreed to arbitrate.

Accordingly, Plaintiff's claims fall within the scope of the arbitration provision in the February 2020 Agreement.

### c.   The termination provision is enforceable

Defendant contends that "courts across the country enforce agreements to arbitrate claims arising after termination of the underlying contract" and that Plaintiff's "half-hearted references to unconscionability fall far short of meeting his burden under New York law."
(Def.'s Reply 7–10.)

Plaintiff argues that the arbitration provision in the February 2020 Agreement is overly broad and cannot be read to cover disputes that arose after the expiration of the agreement, as the clause is both "unconscionable" and "absurd" in its purported breadth.[4]  (Pl.'s Opp'n 10–13.)

_____

[4]  Although Plaintiff contends that the arbitration clause is both "unconscionable" and "absurd" in its proposed breadth in one sentence, (Pl.'s Opp'n 11), he does not provide any

An arbitration provision can survive the termination of a contract.  *See Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionery Workers Union, AFL-CIO*, 430 U.S. 243, 253–55 (1977) ("[I]n the absence of some contrary indication, there are strong reasons to conclude that the parties did not intend their arbitration duties to terminate automatically with the contract."); *Butchers, Food Handlers & Allied Workers Union, Loc. 174 v. Hebrew Nat'l Kosher Foods, Inc.*, 818 F.2d 283, 287 (2d Cir. 1987) ("If the contract does not state that the duty to arbitrate ends with the termination of the contract, the strong policies favoring arbitration should ordinarily lead the court to conclude that the obligation to arbitrate — especially as to claims that accrued during the term of the contract — survives the expiration of the contract."); *Aksman v. Greenwich Quant. Rsch. LP*, 563 F. Supp. 3d 139, 158 (S.D.N.Y. 2021) (finding that the agreement to arbitrate remained in effect where the "severability provision . . . bespoke an intent for the arbitration obligation to survive the termination . . . of [the plaintiff's] employment" and collecting cases finding that the agreement to arbitrate survived the termination of the parties' underlying agreement); *Salzano v. Lace Ent.*, No. 13-CV-5600, 2014 WL 3583195, at *4 (S.D.N.Y. July 18, 2014) (holding that parties to an expired contract are still subject to its arbitration clause unless the parties clearly intended to limit the provision to disputes or claims arising during the duration of the contract).  When the parties expressly provide that an arbitration provision survives termination, it survives.  *See Dogan v. KeyBank, N.A.*, No. 18-CV-205, 2018 WL 4927524, at *2 (N.D.N.Y. Oct. 10, 2018) (holding that the arbitration provision stating that the provision survived termination of bank accounts applied to dispute a decade later); *Diaz v. Michigan Logistics Inc.*, 167 F. Supp. 3d 375, 383 (E.D.N.Y. 2016) (compelling

---

additional arguments as to its unconscionability and does not otherwise argue that the February 2020 Agreement is either procedurally or substantively unconscionable.  The Court therefore does not address this issue.

arbitration where the arbitration provision "expressly provide[d]" that the provision survived termination).

The February 2020 Agreement states that "[t]he terms of the arbitration provision shall survive termination, amendment or expiration of th[e] [a]greement." (*Severability and Survival*, General Terms of Service § 26(h)); *see ACE Cap. re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 34–35 (2d Cir. 2002) (compelling arbitration where the arbitration clause contemplated arbitration between the parties for "any dispute . . . , whether such dispute arises before or after termination of [the agreement]"); *see also Horton v. Dow Jones & Co., Inc.*, 804 F. App'x 81, 84–85 (2d Cir. 2020) (ruling that provision providing that the "agreement to arbitrate shall survive termination of [the agreement]" was valid and waived the plaintiff's right to class actions). Thus, this provision survives expiration of the February 2020 Agreement.

Plaintiff primarily relies on two cases to argue that "infinite arbitration clauses" have been "universally rejected by courts." (Pl.'s Opp'n 10 (first citing *McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264 (S.D.N.Y. 2021); and then citing *Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500 (E.D.N.Y. 2016)).) Both are inapposite. In *McFarlane*, the court examined the identical arbitration provision currently before the Court, but the defendant moved to compel arbitration of a suit by former employees whose personal information had been exposed in a company data breach. 524 F. Supp. 3d at 268. Several of the plaintiffs had signed agreements containing the arbitration provision as *subscribers* of the defendant, rather than as employees, and the court declined to grant the defendant's motion to compel arbitration because the plaintiffs were proceeding as employees (rather than subscribers) of defendant and because the "claims at issue lack[ed] any nexus whatsoever to the agreement containing the clause." *Id.* at 276–77. In *Wexler*, the plaintiff received wireless phone service from a telephone company other than the

defendant.[5]  211 F. Supp. 3d at 501.  The plaintiff brought claims against the defendant when the

defendant "began making unsolicited calls and sending unsolicited text messages to her cell

phone."  *Id.*  The court denied the defendant's motion to compel because the plaintiff's claims

were not "connected in some way to the service agreement."  *Id.* at 504.

Unlike both of these cases, Plaintiff is a "subscriber[] of [Defendant]" and, as discussed

above, the claims have a nexus to the provision in the February 2020 Agreement because the

outstanding fees stem from services that Plaintiff obtained through the February 2020

Agreement, and it was operative at the time that Plaintiff accumulated the invoices and when

Defendant terminated Plaintiff's services.  (Compl. ¶ 14.)  Plaintiff's claims arise from the

"alleged 'non-payment' of monthly service fees from March 15, 2020 to June [of] 2020, during

the height of the Covid pandemic," which led to the termination of his services, the charge of a

one-time activity fee, and the alleged "drastic increase in . . . monthly service bills that would be

charged to all such customers in the first month of restored service," and therefore are directly

related to his internet and cell phone services under the February 2020 Agreement.  (*Id.* ¶¶ 2,

121, 126.)

Accordingly, the termination clause in the arbitration provision is enforceable.

**d.   The Court stays the litigation pending arbitration of Plaintiff's claims**

Defendant argues that the FAA requires a stay of proceedings when all claims are

referred to arbitration and the parties request a stay.  (Def.'s Mem. 14 (quoting *Katz*, 794 F.3d at

343).)

---

[5]  Although the telephone company was an affiliate of the defendant, it was a separate
entity.

Plaintiff contends that a motion to compel arbitration is premature in cases involving a putative class action, and thus, the action should not be stayed.  (Pl.'s Opp'n 13–14.)

Courts in this Circuit regularly hold that "the earliest time to move to compel arbitration [as to unnamed class members] is after class certification." *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 234–35 (S.D.N.Y. 2020) (collecting cases), *objections overruled*, No. 10-CV-6950, 2021 WL 4199912 (S.D.N.Y. Sept. 15, 2021); *Jensen v. Cablevision Sys. Corp.*, 372 F. Supp. 3d 95, 123 (E.D.N.Y. 2019) ("This [c]ourt will not compel absent putative class members who are not before this [c]ourt to binding arbitration or issue a ruling regarding the enforceability of the provision.").  Where the motion to compel is brought against named plaintiffs, however, courts may properly consider the motion and must grant a stay after all claims have been referred to arbitration.  *See Bernardino v. Barnes & Noble Booksellers, Inc.*, 763 F. App'x 101, 104 (2d Cir. 2019) ("As we have held, a district court is required to enter a stay when a party has so requested and 'all claims have been referred to arbitration.'" (quoting *Katz*, 794 F.3d at 345)); *Katz*, 794 F.3d at 345 ("We join those Circuits that consider a stay of proceedings necessary after all claims have been referred to arbitration and a stay requested."); *Paltz v. All. Healthcare Servs., Inc.*, No. 21-CV-0020, 2022 WL 633732, at *8 (D. Conn. Mar. 4, 2022) ("The [c]ourt therefore finds that a valid arbitration agreement has been formed and will impose a stay in the case until the conclusion of the arbitration proceeding." (citing *Nicosia*, 834 F.3d at 229)).

Defendant does not move to compel arbitration against the absent putative class members prior to certification of a class, but solely against Plaintiff, and thus the Court may properly rule on the motion to compel.  *See Katz*, 794 F.3d at 345; *Roberts v. Petersen Invs.*, 214 F. Supp. 3d 237, 240 (S.D.N.Y. 2016) ("A stay in this case will permit prompt arbitral resolution of [the

plaintiff's] claim and permit the parties 'to proceed to arbitration directly, unencumbered by the uncertainty and expense of additional litigation should judicial participation prove necessary.'" (alterations omitted)); *see also Nelson v. Park City 3&4 Apartments, Inc.*, No. 16-CV-3533, 2021 WL 5304052, at *5 (E.D.N.Y. Nov. 15, 2021) (granting motion to compel arbitration and staying the case pending the completion of arbitration proceedings) (citing *Roberts*, 214 F. Supp. 3d at 240).

### III.   Conclusion

For the foregoing reasons, the Court grants Defendant's motion to compel and stays the litigation pending the completion of arbitration proceedings.

Dated: June 30, 2022
       Brooklyn, New York

                         SO ORDERED:

                         _____s/ MKB_____
                         MARGO K. BRODIE
                         United States District Judge